22CA1203 Peo v Demiter 12-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1203
Routt County District Court No. 21CR28
Honorable Michael A. O'Hara III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sean Michael Demiter,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 31, 2025

---

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Rachel C. Funez, Alternate Defense Counsel, Glenwood Springs, Colorado, for Defendant-Appellant

¶ 1    Defendant, Sean Michael Demiter, appeals his judgment of conviction and sentence for unlawful sexual contact, second degree tampering, theft, unauthorized use of a financial transaction device, and identity theft.  We affirm the judgment but reverse the sentence in part and remand the case with directions to correct the mittimus.

## I.    Background

¶ 2    J.S. met Demiter when she rented a room in his apartment in Steamboat Springs.  According to J.S., the two became "intimate" but were never a couple.  Eventually, J.S. informed Demiter that she was moving out of the apartment.  J.S. testified that Demiter saw her packing and became angry.  According to J.S., Demiter appeared to calm down at points but then would become angry again.  J.S. testified that Demiter calmed down and told her she could stay and pack her things, but the next morning, things escalated.

¶ 3    While J.S. was half asleep, Demiter asked her if he could borrow her debit card to buy a soda.  J.S. agreed.  Demiter then showed J.S. a video and pictures of him masturbating above her head and told her he would take the video to her place of work so that her colleagues "could know what a whore [she] was."  J.S.

testified that she didn't know Demiter had masturbated over her head and wouldn't have known if he hadn't showed her the video or pictures. According to J.S., she drank the night before until she passed out, and Demiter told her that he took the video and photos while she was passed out. Evidence presented at trial established that Demiter sent J.S.'s then ex-boyfriend a photo of a penis on J.S.'s face.

¶ 4 After showing J.S. the video and photographs, he offered to help her pack and began grabbing her things. According to J.S., Demiter threw her things in her van and piled them outside her door. Demiter then started screaming at her. He threw her potted plants in her suitcase, threw her skis onto the sidewalk, and threw a heap of clothes on top of the broken pots. J.S. also testified that while she was trying to walk away from Demiter, he grabbed her necklace multiple times and pulled to "yank [her] back." J.S. decided to leave the remainder of her things and go to a hotel for the night.

¶ 5 J.S. called Demiter the next day to pick her up so she could get the rest of her things. J.S. testified that Demiter again began throwing her things outside and into the van and that Demiter spat

2

on her van. After getting the remainder of her things, J.S. left. J.S. testified that Demiter "smashed" her potted plants, got soil inside her car, and, at some point, wrote "whore" on each page of her day planner. She also testified that her backpack was covered in liquid soap.

¶ 6    J.S. testified that after the incident, she noticed that her bank account was "almost completely empty." According to J.S., she didn't recognize two withdrawals from an ATM, one for $102.95 and one for $103.00. J.S. confirmed that Demiter had taken her debit card and returned it to her but that she didn't authorize him, or anyone else, to make either withdrawal. The prosecution introduced surveillance footage from one of the ATM locations at trial, and Officer Thomas Barnett of the Steamboat Springs Police Department testified that it showed a man, believed to be Demiter, making a transaction at the ATM.

¶ 7    Demiter was arrested and charged with two counts of unlawful sexual contact, one count of assault in the third degree, one count of menacing, one count of false imprisonment, one count of harassment, one count of criminal mischief, one count of second degree criminal tampering, one count of theft, one count of

unauthorized use of a financial transaction device, one count of criminal possession of a financial device, one count of identity theft, and six counts of a violation of bail bond conditions. The District Attorney dismissed all counts related to menacing, harassment, criminal mischief, criminal possession of a financial device, and a violation of bail bond conditions. The jury found Demiter guilty of one count of unlawful sexual contact, second degree tampering, theft, unauthorized use of a financial transaction device, and identity theft. The jury acquitted Demiter of the remaining charges.

¶ 8 The court sentenced Demiter to a controlling twelve-month jail sentence for the unlawful sexual contact, tampering, theft, and unauthorized use of a financial transaction device convictions, followed by a consecutive sentence of five years in the custody of the Department of Corrections for the identity theft conviction.

## II.   Analysis

¶ 9 Demiter raises six arguments on appeal. He contends that (1) the trial court erred by denying his motion to suppress statements he made during his arrest; (2) the trial court erroneously admitted a screenshot of J.S.'s bank account without proper authentication and in violation of the rule against hearsay;

4

(3) the prosecutor engaged in multiple instances of prosecutorial misconduct; (4) the jury instructions constructively amended the sexual contact charge; (5) the trial court erred by not giving a modified unanimity instruction on the tampering charge; and (6) the trial court erroneously applied Demiter's presentence confinement credit (PSCC) to only his sentence for the misdemeanor convictions, not the felony conviction. We consider each contention below.

### A.    The Denial of Motion to Suppress Demiter's Statements

¶ 10    Demiter first contends that the trial court erred by denying his motion to suppress statements he made during his arrest. We disagree.

### 1.    Additional Facts

¶ 11    Before trial, Demiter filed a motion to suppress statements he made incident to his arrest. The court held a hearing on the motion, and the following facts were established at the hearing.

¶ 12    The Steamboat Springs Police Department obtained a warrant to arrest Demiter and went to his home to try and contact him. Initially, officers were unable to reach Demiter, but Demiter called the police, and Sergeant Richard Brown was eventually able to

reach Demiter by phone. Sergeant Brown told Demiter that there were warrants out for his arrest and encouraged Demiter to turn himself in. But, according to Sergeant Brown, Demiter was "upset about the warrants," leading him to believe it was unlikely Demiter would turn himself in. After speaking with Demiter's sister and J.S., Sergeant Brown became increasingly worried about Demiter's mental health. Demiter didn't turn himself in, and five officers in total, including Sergeant Brown, went to Demiter's home to attempt to arrest him.

¶ 13 While determining how to approach Demiter's unit, officers on one side of the building noticed that Demiter had written, "I kill cops," on the sliding glass door. Sergeant Brown testified that he heard a lot of banging coming from Demiter's apartment and then Demiter exited his apartment. Sergeant Brown yelled at Demiter to come out, but Demiter ran back inside. Sergeant Brown followed Demiter inside the unit and testified that while inside, he saw Demiter holding two large knives and yelling, "F you," at him. Sergeant Brown stated that Demiter was "holding the knives in a very aggressive way, and was very threatening with them." Eventually, Demiter barricaded himself in a bedroom. According to

Sergeant Brown, the efforts to convince Demiter to exit the bedroom went on for approximately four hours. Sergeant Brown's body camera footage recorded the full encounter.

¶ 14     During the suppression hearing, the prosecutor introduced a portion of the body camera footage. The video depicts police arriving at Demiter's home and Demiter exiting and then retreating into his home. While he is locked in the bedroom, Demiter begins yelling at the officers, and Sergeant Brown responds and attempts to "deescalate the situation."

¶ 15     As relevant here, during this interaction, Demiter stated the following:

- "All I did was take pictures having sex."

- "I'm not going to jail for fucking having my cock in her mouth that she was fucking willing to take pictures of."

- "I'm not going to jail for loving a woman."

- "I sent her ex a dick pic."

- "It was all consensual. There's no video. There was never five dudes. It was always just me and her."

- "I took a picture. Sorry. She said it was okay."

- "I loved her."

- "I paid for her flight to go fuck some dude. Yes, I was angry. Yes, I tossed all her shit outside."

¶ 16    Sergeant Brown testified that he didn't advise Demiter of his *Miranda* rights before or during this interaction and acknowledged Demiter wasn't free to leave the apartment.

¶ 17    After watching the video, the trial court found that while Demiter was "effectively under arrest" without a *Miranda* advisement, there wasn't a "custodial interrogation by law enforcement designed to elicit an incriminating response."

¶ 18    The body camera footage wasn't introduced at trial, but at trial, Sergeant Brown testified in detail about the statements Demiter made during the encounter.

2.    Legal Principles and Standard of Review

¶ 19    Pursuant to the Fifth Amendment of the United States Constitution, "No person . . . shall be compelled in any criminal case to be a witness against himself." Because of this privilege, a suspect must be advised of his rights under the Fifth Amendment before being subjected to a custodial interrogation. *People v. Sampson*, 2017 CO 100, ¶ 17 (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)). The prosecution can't introduce in its case-in-

chief any statements "procured by custodial interrogation" that weren't preceded by certain warnings. *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010) (citing *Miranda*, 384 U.S. at 444).

¶ 20 *Miranda* safeguards are necessary "whenever a person in custody is subjected to either express questioning or its functional equivalent." *People v. Wood*, 135 P.3d 744, 749-50 (Colo. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). "Interrogation includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* at 750 (quoting *Innis*, 446 U.S. at 301). When assessing whether an officer should have known their words or actions "were reasonably likely to elicit an incriminating response, 'we consider the totality of the circumstances surrounding the making of the statement.'" *Id.* (quoting *People v. Gonzales*, 987 P.2d 239, 241 (Colo. 1999)). The focus of our inquiry is on "whether the officer reasonably should have known that his words or actions would cause the suspect to perceive that he was being interrogated." *Id.* (citation omitted).

¶ 21     When reviewing a trial court's suppression order, we defer to the trial court's findings of fact if competent evidence in the record supports them, but we review legal conclusions de novo. *Compos v. People*, 2021 CO 19, ¶ 16.

### 3.     Application

¶ 22     Because Demiter wasn't subjected to an interrogation when he made the statements, the trial court didn't err by denying his motion to suppress.

¶ 23     Demiter argues that an interrogation occurred because Sergeant Brown engaged in relationship building with Demiter by discussing case information and asking Demiter to talk to him. Combined with his "extremely vulnerable emotional state," Demiter argues this case is like *Wood*, in which our supreme court found that the functional equivalent of an interrogation occurred. *See Wood*, 135 P.3d at 751. In *Wood*, the defendant wasn't informed of the nature of the charges against him but was placed under arrest and in a holding cell. *Id.* at 746, 751. The detective told the defendant that the purpose of the interview was "to get both sides" and asked the defendant "to tell his side of the story." *Id.* at 750-51. In determining that the functional equivalent of an

interrogation had occurred, the court also considered the defendant's "harried emotional state" and the trial court's finding that the detective engaged in relationship building with the defendant. *Id.* at 751.

¶ 24     But the circumstances of this case are wholly distinguishable from those in *Wood*. First, Demiter wasn't placed in a holding cell; rather, when officers entered Demiter's apartment, they found him holding knives in an offensive posture, and then Demiter barricaded himself in a room. Second, Demiter knew of the allegations against him before the standoff and knew that the purpose of the officers' visit was to arrest him, not just to hear his side of the story, as the officers told the defendant in *Wood*. *See id.* at 746. Indeed, Sergeant Brown had discussed the arrest warrant with Demiter earlier that day. And most importantly, the officers didn't initiate discussions about the case with Demiter. Rather, Seargent Brown initially told Demiter to "put the knife down" and to "come on out," but Demiter quickly began discussing the allegations by yelling out that "he didn't hurt her." Sergeant Brown responded, "[W]e didn't say you did." While Demiter contends that this was "relationship building" akin to an interrogation, the tense situation warrants a

11

different conclusion. At that point, both J.S. and Demiter's sister had discussed their concern for his well-being, Demiter had been seen wielding two knives, and Demiter had barricaded himself inside a room. Under these circumstances, it isn't probable that Sergeant Brown would believe his response would elicit an incriminating statement from Demiter or that Demiter would believe he was being interrogated. Rather, as Sergeant Brown testified, it was a response meant to deescalate the situation. *See id.* at 751 (an officer's intent is relevant to an interrogation inquiry but isn't the "primary focus").

¶ 25 As the standoff continued, Sergeant Brown made more comments in an effort to deescalate the situation, such as, "I told you I'd listen to you," "[C]ome out and talk to me," and "I told you that I'd would work with you." These comments were made in response to Demiter's statements that he had "armor piercing" bullets or "9 mm cop killers"; that "somebody's leaving in a body bag"; that he was "ready to die"; and that "[he] wanted to die yesterday." Under these escalated and potentially dangerous circumstances, the statements similarly don't indicate that Sargeant Brown reasonably should have known his words would

12

cause Demiter to perceive he was being interrogated. Indeed, Sergeant Brown's repeated statements, "I don't want to hurt you and you don't want to hurt anybody," "I don't want to kill you," "I don't want anyone to die," "[I]t doesn't have to end this way," and "[N]o one's gonna leave in a body bag," should have indicated to Demiter that he wasn't being interrogated.

¶ 26    Accordingly, we conclude that Demiter's statements weren't the product of an interrogation. And because a *Miranda* advisement isn't necessary in the absence of an interrogation, we need not address the People's alternative contention that Demiter wasn't in custody.

B.    The Admission of the Screenshot of J.S.'s Bank Account

¶ 27    Demiter next contends that the trial court erred by admitting a screenshot of J.S.'s bank account at trial. According to Demiter, the account wasn't properly authenticated and constituted inadmissible hearsay. We aren't persuaded.

1.    Additional Facts

¶ 28    At trial, J.S. testified that, after leaving Steamboat Springs, she noticed her bank account was "almost completely empty." According to J.S., she noticed the reduced funds while checking her

13

account through "online banking." The prosecutor presented a screenshot of J.S.'s bank account to her and asked her to authenticate it. J.S. confirmed that it was a "screenshot from [her] phone of [her] online banking." The prosecutor then asked J.S. whether she recognized two ATM transactions on the screenshot, and J.S. stated that she didn't.

¶ 29 The prosecutor moved for admission of the screenshot, and defense counsel requested a bench conference. During the bench conference, defense counsel objected to "[J.S.] identifying or authenticating" the screenshot. Defense counsel expressed that J.S. wasn't the custodian of the record and that J.S. wasn't the proper witness to introduce the record through. The trial court overruled the objection stating, "[S]he's authenticating a photograph known as a screenshot of what's on her — cell phone screen. She's testified to that already. That's the authentication. Now what it means, I suppose, is subject to examination." The trial court then admitted the screenshot.

### 2. Standard of Review and Preservation

¶ 30 "We review a trial court's evidentiary ruling for an abuse of discretion." *Gonzales v. People*, 2020 CO 71, ¶ 25. "A trial court

14

abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *People v. Abdulla*, 2020 COA 109M, ¶ 61. When an issue is preserved, we apply the nonconstitutional harmless error standard to a trial court's evidentiary rulings. *People v. Martinez*, 2020 COA 141, ¶ 27; *see Hagos v. People*, 2012 CO 63, ¶ 12. Under this standard, "reversal is warranted if the error affects the substantial rights of the parties, meaning 'the error substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Martinez*, ¶ 28 (quoting *Zapata v. People*, 2018 CO 82, ¶ 61).

¶ 31 Both parties agree that Demiter preserved his authentication objection. But Demiter and the People dispute whether Demiter preserved his hearsay contention.

¶ 32 To preserve an objection to evidence admitted at trial, a party must make a "timely and specific objection." *People v. Coughlin*, 304 P.3d 575, 581-82 (Colo. App. 2011) (quoting *Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 325 (Colo. 2009)). An objection allows the trial court to "focus on the issue and hopefully avoid the error." *Id.* at 582. But "[e]ven if an objection to evidence does not specifically identify the rule underlying the objection, it is

15

nonetheless sufficient to preserve an issue for appeal if the objecting attorney presents arguments or utilizes language that alerts the trial court to the impending error." *Id.*

¶ 33     Although authentication and hearsay are two separate evidentiary bars, both bars may be cleared by an affidavit or testimony of a custodian in certain circumstances. CRE 902(11); CRE 803(6). When objecting, defense counsel expressed that J.S. wasn't the proper custodian because this was a bank record. Because of the language used, the trial court should have been alerted that its admission might implicate issues with both authentication and hearsay. Moreover, in ruling on the authentication objection, the court acknowledged that the content of the document might present separate hearsay issues. Thus, we conclude that Demiter's hearsay contention was properly preserved.

### 3.     Application

¶ 34     Authenticity and hearsay are two separate hurdles to admissibility that are governed by the Colorado Rules of Evidence. *See* CRE 901(a); CRE 802. Because Demiter challenges the admission of the bank records on both authenticity and hearsay grounds, we address each in turn.

## a. Authentication

¶ 35 Authentication is "a condition precedent to admissibility" and "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a). The proponent bears the burden of authenticating evidence by "a prima facie showing." *People v. N.T.B.*, 2019 COA 150, ¶ 16 (quoting *People v. Glover*, 2015 COA 16, ¶ 13). But the quantity or nature of proof required for authentication isn't definitively established in CRE 901. *N.T.B.*, ¶ 17. And the trial court must determine "whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Gonzales*, ¶ 27 (citation omitted). If the burden of authentication is met, then the actual authenticity of the evidence or any defects in the authenticity of the evidence "go to the weight of evidence and not its admissibility." *N.T.B.*, ¶ 16. Under CRE 901(b)(1), one method of authentication is by testimony of a witness with knowledge "that a matter is what it is claimed to be."

¶ 36 In this case, the screenshot was admitted after J.S. testified that she took the screenshot and that it was a picture of her online

banking account.  Under CRE 901(b)(1), this is enough for proper authentication.

¶ 37    Demiter cites *N.T.B.*, ¶¶ 20, 33, to support his contention that because the screenshot was of an electronic record without an acknowledgement of authorship, it couldn't properly be authenticated through J.S.  We acknowledge that the screenshot admitted through J.S. doesn't contain significant identifying information.  But even without more identifying information, the trial court could properly find that J.S. authenticated the screenshot because she testified that it was her bank account, that she took the screenshot, and that she wasn't concerned about another charge (from City Market) shown on the screenshot.  *See id.* at ¶ 33 ("CRE 901 is a flexible standard.  The type and quantity of evidence necessary to authenticate a particular piece of evidence will always depend on context."); *cf. Glover*, ¶ 26 ("To establish that a printout contains content from Facebook or another social networking website, courts have relied on testimony regarding how the records were obtained, the substance of the records themselves, and affidavits or testimony from employees of the social networking site.").

### b.     Hearsay

¶ 38    Authenticity, however, "does not guarantee admissibility," and authentic evidence may be inadmissible on hearsay grounds. *N.T.B.*, ¶¶ 21-22.  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  CRE 801(c). Unless it's permitted by the rules of evidence, a statute, or a procedural rule, hearsay is inadmissible.  CRE 802.  Unlike authentication, when "a court allows the jury to weigh questionably authentic evidence, a hearsay objection presents a binary choice — courts must exclude hearsay unless its proponent satisfies an exception."  *N.T.B.*, ¶ 23.

¶ 39    Assuming without deciding that none of the hearsay exceptions apply, we conclude that any error in admitting the screenshot was harmless.

¶ 40    At trial, Demiter admitted making two withdrawals for approximately $100 each using J.S.'s card.  But Demiter stated that he withdrew the money at J.S.'s request and gave her the money. Because Demiter admitted to withdrawing approximately $200 from J.S.'s account on the dates in question, the screenshot was cumulative of Demiter's testimony.

¶ 41      Demiter contends that the admission of the screenshot wasn't harmless because the court would have had to grant his motion for judgment of acquittal on the "financial counts at the close of the State's case" in the absence of the screenshot. We aren't persuaded. Even without the screenshot and the ATM surveillance footage admitted after tracking one of the ATM withdrawals, the People still introduced enough evidence during its case-in-chief to survive a motion for a judgment of acquittal. That evidence included J.S.'s testimony that Demiter withdrew money from her account without her consent, that approximately $200 was missing from her account in transactions she hadn't authorized, and that Demiter had been in possession of her debit card and PIN. Thus, the asserted hearsay error doesn't require reversal.

## C.     Prosecutorial Misconduct

¶ 42      Demiter next contends that his judgment of conviction should be reversed because there was prosecutorial misconduct throughout the trial. We aren't persuaded.

### 1.     Standard of Review

¶ 43      When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People,* 235 P.3d 1089, 1096 (Colo.

20

2010).  First, we "determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review."  *Id.*  Because these steps are "analytically independent of the other," we could conclude that the prosecutor's conduct was improper but decline to reverse the judgment because the error was harmless.  *Id.*

¶ 44    The standard of review we apply after determining prosecutorial impropriety "varies depending on the circumstances." *Id.* at 1097.  If an error "specifically and directly offend[s] a defendant's constitutional rights" and the defendant contemporaneously objected at trial, then the error is subject to constitutional harmless error review.  *Id.*; *People v. Licona-Ortega,* 2022 COA 27, ¶ 86.  Constitutional harmless errors require reversal unless the error "was harmless beyond a reasonable doubt." *Hagos,* ¶ 11 (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)).  If the error isn't of constitutional magnitude and the defendant contemporaneously objected at trial, we subject the prosecutor's misconduct to "general harmless error review."  *Wend,*

235 P.3d at 1097.  Under this type of review, we reverse only "if the error affects the substantial rights of the parties."  *Hagos*, ¶ 12.

¶ 45    But if the defendant fails to contemporaneously object to the prosecutor's misconduct — whether the misconduct implicates a constitutional right or not — then we review for plain error.  *Wend*, 235 P.3d at 1097; *see Hagos*, ¶ 14.  Prosecutorial misconduct constitutes plain error if it's "'flagrant or glaringly or tremendously improper' and so undermine[s] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *People v. Carian*, 2017 COA 106, ¶ 52 (quoting *People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005)).

¶ 46    If we conclude that a prosecutor's statements were improper, we must then determine whether "they affected the fundamental fairness of the trial" by "examin[ing] a variety of factors under the totality of the circumstances."  *Id.* at ¶ 55.  The factors we examine include

> 'the exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, . . . the strength of the other evidence of guilt,' . . . 'the severity and frequency of the misconduct[,] . . . and the likelihood that the

22

> misconduct constituted a material factor
> leading to the defendant's conviction.'

*Id.* (alteration in original) (quoting *People v. Cordova*, 293 P.3d 114, 122 (Colo. App. 2011)).

### 2. Application

¶ 47     In his opening brief, Demiter appears to contend that the prosecutor engaged in misconduct on five occasions over the course of the trial. We address each instance of alleged misconduct in the order it occurred during trial.

### a. Opening Statements

¶ 48     Two of the alleged instances of prosecutorial misconduct occurred during the prosecution's opening statement. "A prosecutor's opening statement is limited to the evidence that will be adduced at trial." *People v. Melanson*, 937 P.2d 826, 836 (Colo. App. 1996). Unproved remarks "ordinarily constitute reversible error if there has been an affirmative showing of bad faith and manifest prejudice." *Id.* Moreover, a prosecutor may not "induce the jury to determine guilt on the basis of passion or prejudice" or "appeal to the jurors for sympathy for the victim." *People v. Fortson*, 2018 COA 46M, ¶ 50 (citation omitted).

### i.    Comments on J.S.'s Background

¶ 49    During opening statements, the prosecutor began explaining how J.S. arrived in Steamboat Springs and met Demiter.

> She'll tell you she had had some pretty rough times in her life previously. She had gotten divorced, she'd had deaths in the family, she was going through rough times, and she really wasn't looking for a relationship at that point. But one thing led to another, her and Mr. Demiter spent more and more time together. They became involved.

¶ 50    Demiter didn't object to this statement. During trial, the jurors didn't hear evidence of deaths in J.S.'s family.

¶ 51    Demiter contends that the prosecutor improperly appealed to the jurors' sympathies by telling them J.S. had experienced deaths in the family and gone through a divorce. But these statements were brief, and therefore, even if they improperly evoked the jury's sympathy, they weren't so flagrant or glaringly improper so as to constitute reversible error. Further, while J.S.'s marital status could evoke juror sympathy, it was a relevant fact introduced at trial and, therefore, was appropriate background information for the prosecutor to include in opening statement.

¶ 52    Demiter also argues that the prosecutor committed misconduct by describing evidence that wasn't ultimately admitted at trial.  We agree with Demiter that evidence wasn't presented to support the statement that J.S. had experienced deaths in the family.  But there isn't a showing of bad faith or prejudice to Demiter.  Thus, reversal isn't required.  *See Melanson*, 937 P.2d at 836.

### ii.    Comments About J.S.'s Debit Card

¶ 53    During opening statement, the prosecutor began telling the jury about the transactions on J.S.'s debit card and stated that "[J.S.] never saw her debit card again."  Demiter didn't object to this statement.  During the trial, however, J.S. testified that her debit card was returned to her.

¶ 54    That the prosecutor incorrectly stated that J.S. didn't see her debit card again was improper (assuming that the prosecutor knew or had reason to know that the evidence at trial would show otherwise).  But similar to the prosecutor's statements about J.S.'s background, this fleeting statement didn't prejudice Demiter, nor was there any indication of bad faith on the part of the prosecutor.  Therefore, even if the incorrect statement constituted misconduct, it

doesn't warrant reversal. *See id.* Moreover, any misleading impression left by the prosecutor's statement was cleared up by J.S.'s testimony.

### b. Demiter's Cross-Examination

¶ 55 The prosecutor cross-examined Demiter about the photos he sent to J.S.'s ex-boyfriend that showed J.S. with a penis on her face. Demiter denied that it was his penis in the photos. Demiter also testified that he sent the photos to J.S.'s ex-boyfriend to ask him if it was his penis and that J.S.'s ex-boyfriend responded by sending Demiter a picture of his penis. While continuing to ask Demiter about his decision to send the pictures to J.S.'s ex-boyfriend, the prosecutor asked Demiter, "[A]re you of heterosexual orientation?" The prosecutor then asked, "And to the best of your knowledge, [J.S.'s ex-boyfriend] is —" At that point, defense counsel objected but the court overruled it. Demiter then stated, "I — no idea." And when the prosecutor repeated, "No idea?" Demiter stated, "And if [J.S.'s ex-boyfriend] is a heterosexual or a homosexual? No ma'am. I have no clue."

¶ 56 A "prosecutor[] may not resort to 'inflammatory comments' that serve no purpose but 'inflam[ing] the passions of the jury.'"

26

*People v. McBride*, 228 P.3d 216, 222 (Colo. App. 2009) (quoting

*Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005)). And

here, given the context, we can't conclude that the purpose of the

prosecutor's questioning was to inflame the passions of the jury.

Rather, it appears that the prosecutor was attempting to discern

why Demiter sent a picture of a penis (that he alleged wasn't his) to

J.S.'s ex-boyfriend and why J.S.'s ex-boyfriend responded with a

picture of his own penis. Whether this was a proper purpose for the

question is a close call. *Cf. People v. Samson*, 2012 COA 167, ¶ 30

("[B]ecause arguments delivered in the heat of trial are not always

perfectly scripted, reviewing courts accord prosecutors the benefit of

the doubt when their remarks are ambiguous or simply inartful.").

But at no point in his briefing does Demiter explain how the

prosecutor's questions, even if improper, were inflammatory or

undermined the fairness of trial. And we don't discern that it did.

Thus, based on the record, we can't conclude that the prosecutor's

questions warrant reversal.

### c. Closing Argument

¶ 57     Two of the alleged instances of prosecutorial misconduct

occurred during the prosecutor's closing argument. Closing

argument "may properly include the facts in evidence and any reasonable inferences drawn therefrom." *Domingo-Gomez*, 125 P.3d at 1048. During closing argument, parties may "point to different pieces of evidence and explain their significance within the case." *Id.* And while a prosecutor can't use closing argument to "mislead or unduly influence the jury," the prosecutor "has wide latitude in the language and presentation style used to obtain justice." *Id.* at 1048-49.

### i. Statements About Loving a Woman

¶ 58    During opening statement, the prosecutor stated, "At one point, . . . Demiter characterize[d] these events as just loving a woman." Then in closing argument, the prosecutor repeatedly stated, "These acts are not love as Mr. Demiter characterized them . . . . These are acts of violence. These are acts of coercion. These are acts of control, punishment, intimidation, and revenge." Demiter didn't object to these statements.

¶ 59    Again, Demiter states that the comments were inflammatory but doesn't explain why. And we can't discern how they were inflammatory. In any event, Demiter doesn't explain why this argument isn't a fair comment on the evidence presented at trial.

### ii. Statements About Body Modification

¶ 60 During closing argument, defense counsel argued that it wasn't Demiter's penis in the picture over J.S. because "he had his penis pierced and he wore a . . . penis ring, and that this was done years before this incident." In rebuttal argument, the prosecutor addressed this argument by referring to admitted photos of Demiter's penis taken after his arrest.

> I would argue [the photos taken after Demiter's arrest] don't show anything that I would dignify by calling a piercing, they show a pen superficially stuck through skin. A bizarre position at a bizarre angle that looks red, it looks angry, it looks inflamed. I would argue this is prisoner body modification and knowledge of guilt. Not a piercing.

¶ 61 Demiter objected to this statement, but the court overruled the objection and reminded the jury that they were "the sole people to determine what the evidence indicated."

¶ 62 Demiter contends that the prosecutor's reference to "prisoner body modification" was improper because it "evokes images of tattooed prison gangs." We agree that the statement was improper, but given its brevity and context, we conclude that the misconduct was harmless.

29

¶ 63    The prosecutor made the statement in response to defense counsel's argument that the picture didn't show Demiter's penis because his was pierced years before. And any risk of prejudice was reduced because the jury had already heard that Demiter was incarcerated when he testified, during direct examination, that the defense exhibit photos of his penis showing a "piercing" were taken at the "Routt County Jail." Further, the prosecutor made the specific statement "prisoner body modification" only once during argument. Accordingly, we conclude that this statement, albeit improper, didn't affect Demiter's substantial rights or undermine the fairness of trial.

                d.    Cumulative Prosecutorial Misconduct

¶ 64    Demiter contends that, even if each individual instance of purported misconduct doesn't warrant reversal, the cumulative prejudice of each instance of misconduct does. We disagree.

¶ 65    Although errors may be harmless or not affect the defendant's substantial rights in isolation, "reversal will nevertheless be required when 'the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process.'" *Howard-Walker v. People,*

30

2019 CO 69, ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).  For reversal based on cumulative error, there must be "cumulative prejudice."  *Id.* at ¶ 25.

¶ 66  As analyzed above, we concluded that the prosecutor committed limited misconduct.  Although the noted statements were improper, or arguably improper, even viewing them collectively, reversal isn't warranted.  We reach this conclusion for largely the same reasons that we declined to reverse based on any individual instance of misconduct.  Each instance was brief and isolated, not the focus of counsel's argument for conviction, and not particularly inflammatory even when considered in combination.  Moreover, the trial court instructed the jury that they "must not be influenced by sympathy, bias or prejudice in reaching [their] decision."  *See People v. Vialpando*, 2022 CO 28, ¶ 41 ("[W]e presume that the jury followed the court's instructions.").  Accordingly, we aren't persuaded reversal is warranted.

### D. Whether the Jury Instructions Constructively Amended the Sexual Contact Charge

¶ 67    Next, Demiter contends that trial court's instructions to the jury on the unlawful sexual contact charge constructively amended the charge.  We agree but conclude that the error wasn't plain.

### 1. Additional Facts

¶ 68    There are six ways in which a defendant can commit class 1 misdemeanor unlawful sexual contact.  *See* § 18-3-404(1)(a)-(g), C.R.S. 2025.  Two of those — subsections (1)(a) and (c) — are relevant to Demiter's constructive amendment challenge.  These subsections provide:

> (1) Any actor who knowingly subjects a victim to any sexual contact commits unlawful sexual contact if:
>
> (a) The actor knows that the victim does not consent; or
>
> . . . .
>
> (c) The victim is physically helpless and the actor knows that the victim is physically helpless and the victim has not consented . . . .

§ 18-3-404(1)(a), (c).

¶ 69    In the complaint and information, the People charged Demiter with two counts of unlawful sexual contact, each alleging that he

"unlawfully and knowingly subjected J.S. to sexual contact, *while the victim was physically helpless and the defendant knew that the victim was physically helpless* and the victim had not consented; in violation of section 18-3-404(1)(c)." (Emphasis added.)

¶ 70    At trial, however, the court gave the jury two instructions on unlawful sexual contact, both framing the offense as a violation of section 18-3-404(1)(a).  Instruction No.11 stated:

> The elements of Unlawful Sexual Contact (Physical Contact) are:
>
> 1.    That Sean Demiter,
>
> 2.    in the State of Colorado, at or about the date and place charged,
>
> 3.    knowingly,
>
> 4.    subjected a person to any sexual contact,
>
> 5.    *knowing that the person did not consent.*

(Emphasis added.)  Instruction No. 12 repeated the same elements, the only difference being that Instruction No.12 was titled "The elements of Unlawful Sexual Contact (Ejaculation)."

¶ 71    Demiter didn't object to either instruction during the jury instruction conference.  The jury convicted Demiter of unlawful

33

sexual contact (physical contact) (Instruction No. 11) but acquitted him of unlawful sexual contact (ejaculation) (Instruction No. 12).

### 2. Legal Principles and Standard of Review

¶ 72 A sufficient information will "advise[] the defendant of the charges he is facing so that he can adequately defend himself and be protected from further prosecution for the same offense." *Campbell v. People*, 2020 CO 49, ¶ 44 (quoting *Cervantes v. People*, 715 P.2d 783, 785 (Colo. 1986)). And giving the defendant sufficient notice of the charges against him "ensure[s] that he is not taken by surprise by the evidence offered at trial." *Id.* (citation omitted). When a charge within the charging instrument is different from the charge a defendant is convicted of, there is a variance. *Id.* at ¶ 45. In Colorado, there are two types of variances: a simple variance and a constructive amendment. *Id.* "A simple variance 'occurs when the evidence presented at trial proves facts materially different from those alleged in the charging document.'" *Id.* (quoting *People v. Smith*, 2018 CO 33, ¶ 25). Reversal isn't typically required for a simple variance if "the proof upon which the conviction is based corresponds to an offense that was clearly set out in the charging instrument." *Id.* Conversely, "[a] constructive amendment

34

occurs when a jury instruction 'changes an essential element of the charged offense and thereby alters the substance of the charging instrument.'" *Bock v. People*, 2024 CO 61, ¶ 14 (quoting *People v. Rediger*, 2018 CO 32, ¶ 48).

¶ 73     We review whether a variance occurred de novo. *People v. Deutsch*, 2020 COA 114, ¶ 22. In the absence of an objection, we reverse a simple variance and a constructive amendment only for plain error. *Bock*, ¶ 26 ("[C]onstructive amendments are reviewed for plain, rather than structural, error."); *see also Smith*, ¶ 25 ("An error in jury instructions, such as a simple variance, generally does not rise to the level of plain error unless a review of the entire record establishes a reasonable possibility that the improper instruction contributed to the defendant's conviction."). "Plain error is obvious and substantial," and we reverse "only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### 3. Constructive Amendment

¶ 74    Demiter contends that the jury instruction constructively amended the sexual contact charge because it didn't contain an element that J.S. was physically helpless or that Demiter knew J.S. was physically helpless. Demiter contends that without these elements, the instruction deviated from section 18-3-404(1)(c).

¶ 75    Because the jury instruction omitted elements of the charged offense, we agree that this constituted a constructive amendment and that the error was obvious. But we conclude the error wasn't plain.

¶ 76    This error should have been obvious to the trial court. It was clear that the charging document stated that Demiter had violated section 18-3-404(1)(c), which states that the "victim is physically helpless and the actor knows that the victim is physically helpless and the victim has not consented."

¶ 77    Although the error was obvious, the error wasn't substantial for three reasons. First, both the charging instrument and the jury instruction required the prosecution to prove that J.S. didn't consent to the unlawful contact. Demiter, therefore, would have had notice that evidence of consent would be produced at trial. And

36

the prosecutor's burden of proof didn't change with respect to this element. Second, while the jury instruction omitted two elements of section 18-3-404(1)(c), the prosecution introduced evidence at trial that J.S. was passed out or unconscious when the unlawful sexual contact occurred, which supported the charging document. And third, the discrepancy between the charging document and the jury instructions wouldn't have altered Demiter's defense. Indeed, in closing argument, Demiter argued to the jury that the prosecutors failed to meet their burden, that he didn't commit the crime alleged, and that the photos didn't depict Demiter's penis. And when discussing whether there was physical contact, defense counsel tacitly conceded J.S.'s helplessness by stating that "she was passed out drunk on her own volition."

¶ 78    Thus, the error wasn't plain, and reversal isn't warranted. *Cf. People v. Weinreich*, 119 P.3d 1073, 1076 (Colo. 2005) ("A jury instruction should substantially track the language of the statute describing the crime; a material deviation from the statute can result in reversible plain error, depending on the facts of the case."). *But see Rediger*, ¶¶ 51-52 (The constructive amendment was plain error because defendant wasn't placed on notice, and "the offense

presented to the jury allowed it to convict [the defendant] of a crime not charged in the information, and one for which the People's burden of proof was materially lessened.").

### E. Modified Unanimity Instruction

¶ 79    Demiter next contends that the trial court erred by declining to give a modified unanimity instruction on the tampering charge. We aren't persuaded.

#### 1. Additional Facts

¶ 80    Demiter was charged with one count of second degree criminal tampering under section 18-4-506, C.R.S. 2025. "[A] person commits the crime of second degree criminal tampering if he tampers with property of another with intent to cause injury, inconvenience, or annoyance to that person or to another." *Id.* The prosecution introduced evidence of several acts purportedly committed by Demiter that could constitute tampering under this statute, including that Demiter threw her potted plants, wrote "whore" in her planner, spat on her van, threw her skis on the ground, and covered her backpack in liquid soap.

## 2. Legal Principles and Standard of Review

¶ 81 Criminal defendants are entitled to a unanimous jury verdict "with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged" but "not with respect to alternative means by which the crime was committed." *People v. Archuleta*, 2020 CO 63M, ¶ 20 (quoting *People v. Taggart*, 621 P.2d 1375, 1387 n.5 (Colo. 1981)). Thus, a jury doesn't need to "unanimously decide 'which of several possible sets of underlying brute facts make up a particular element' or 'which of several possible means the defendant used to commit an element of the crime.'" *Id.* (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999)). But if evidence of multiple acts is presented, "any one of which could constitute the offense charged, and there is a reasonable likelihood that jurors may disagree on the act the defendant committed," the trial court must either provide the jury with a modified unanimity instruction or require the prosecution to elect which transaction it is relying on for the conviction. *People v. Rivera*, 56 P.3d 1155, 1159-60 (Colo. App. 2002); *see also Archuleta*, ¶¶ 21-22. A modified unanimity instruction informs jurors that "to convict the defendant, they 'must either unanimously agree that the defendant

39

committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged.'" *Archuleta*, ¶ 22 (quoting *Thomas v. People*, 803 P.2d 144, 153-54 (Colo. 1990)). If, however, the defendant "is charged with engaging in a single transaction of criminal conduct" and the prosecution proceeds on that theory, an election or modified unanimity instruction isn't required. *Id.* at ¶ 23.

¶ 82 We review a court's failure to give a modified unanimity instruction de novo. *People v. Ryan*, 2022 COA 136, ¶ 15. If the trial court erred by failing to give a modified unanimity instruction but the defendant also failed to request the instruction, then we reverse only if the error was plain. *See id.* at ¶ 16.

3. A Modified Unanimity Instruction Wasn't Required

¶ 83 We acknowledge that the prosecution presented evidence of several acts that separately or together could constitute tampering. But these acts were all part of a single transaction because, while some of the acts occurred on different days, all the acts alleged occurred upon, and were incident to, J.S. moving out of Demiter's apartment. *See, e.g.*, *Melina v. People*, 161 P.3d 635, 640 (Colo. 2007) (concluding that conversations with more than one person

40

and spanning several days "may constitute a single transaction of solicitation"); *People v. Hanson*, 928 P.2d 776, 779-80 (Colo. App. 1996) (concluding that the prosecutor didn't have to specify the acts which formed the basis of the charge because although there were two separate confrontations, "the confrontations occurred in the same location and within a few minutes of each other, and arose out of the same set of circumstances and in conjunction with the same dispute."). Because these acts were part of one transaction, neither an election nor a modified unanimity instruction was required.

F.    The Application of Demiter's Presentence Confinement Credit

¶ 84    Demiter next contends that the trial court erred by applying his PSCC only to his misdemeanor convictions. We agree.

1.    Additional Facts

¶ 85    The court sentenced Demiter to jail sentences of twelve months for unlawful sexual contact, six months for tampering, six months for theft, and six months for unauthorized use of a financial transaction device (misdemeanor convictions). The court specified that the sentences for the misdemeanor convictions would run concurrently with each other. On the identity theft conviction

41

(felony conviction), the court sentenced Demiter to five years in the Department of Corrections. The court ordered the felony conviction sentence to be served consecutively. At the time of sentencing, Demiter was serving sentences for several other cases. The court specified that the sentences for the misdemeanor convictions would run concurrently with the sentences he was currently serving.

¶ 86　At sentencing, the court noted that Demiter had 488 days of PSCC. The court awarded the PSCC for the misdemeanor convictions because the sentences for those counts "were ordered concurrent with each other and his current sentences." But the court declined to award PSCC to the felony conviction sentence "because [the count] is ordered consecutive."

## 2.　Application

¶ 87　We review de novo whether a trial court properly denied PSCC. *Russell v. People*, 2020 CO 37, ¶ 18. Under section 18-1.3-405, C.R.S. 2025, "[a] person who is confined for an offense prior to the imposition of sentence for said offense is entitled to credit against the term of his or her sentence for the entire period of such confinement." "[A] defendant is entitled to PSCC for each day served where there is a substantial nexus between the conduct or

42

charges for which he is confined and the sentence ultimately imposed." *Russell*, ¶ 5.  But a defendant isn't entitled to "duplicative PSCC."  *Id.*  Typically, "when consecutive sentences are imposed, crediting the period of presentence confinement against one of the sentences will assure the defendant full credit against the total term of imprisonment."  *People v. Roy*, 252 P.3d 24, 29 (Colo. App. 2010) (quoting *People v. Johnson*, 797 P.2d 1296, 1298 (Colo. 1990)).

¶ 88    Because neither party contests whether there was a substantial nexus between the PSCC and the charges for which Demiter was sentenced, we don't address it here.  Instead, we only address whether his sentence was duplicative.  In this case, Demiter was awarded 488 days of PSCC on the sentence for the misdemeanor convictions.  But because the maximum sentence on those four charges was twelve months and because the misdemeanor conviction sentences were running concurrently, Demiter received, at most, 365 days of PSCC rather than the full 488 to which he was entitled.  Because the maximum amount of PSCC that could apply to the sentence for the misdemeanor convictions was 365 days, the trial court necessarily deprived

Demiter of some PSCC to which he was entitled. *See Roy*, 252 P.3d at 28 ("Where two or more charges form multiple bases for a defendant's presentence confinement, the defendant is entitled to credit against each sentence imposed on those charges, provided that the credit would not be duplicative."); *see also Johnson*, 797 P.2d at 1299 (trial court must ensure that a defendant receives full but not duplicative PSCC). Thus, the trial court erred. On remand, the court should apply any remaining PSCC against the identity theft sentence.

## III. Disposition

¶ 89 The judgment is affirmed, the sentence is reversed in part, and the case is remanded with instructions for the court to amend the mittimus as described above.

JUDGE KUHN and JUDGE SCHUTZ concur.